IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STEVENS V. TERRAZAS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JAMIE STEVENS, APPELLEE,

V.

MARIA TERRAZAS, APPPELANT.

Filed February 27, 2017.    No. A-17-763.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Reversed and remanded with directions.

David V. Chipman, of Monzón, Guerra & Associates, for appellant.

No appearance for appellee.

RIEDMANN and BISHOP, Judges, and INBODY, Judge, Retired.

BISHOP, Judge.

Maria Terrazas is the biological mother of J.S.; Jamie Stevens adopted J.S. Jamie requested and received a harassment protection order against Maria in the district court for Lancaster County. Maria claims on appeal that there was insufficient evidence to support the harassment protection order. We agree, and reverse and remand with directions to vacate the protection order.

BACKGROUND

The record before us is very lean and alludes to a separate action Maria filed against Jamie pertaining to a "contact agreement" the two women entered into regarding Maria's contact with her biological son, J.S. Jamie acknowledged during the protection order hearing that she was not complying with that agreement, but justified her action based on the judge handling the adoption of J.S. allegedly saying the contact agreement was not in J.S.' best interests. Maria evidently still

- 1 -

claims some right of access to J.S. and has engaged in behaviors Jamie perceives as threatening. The details follow.

On May 11, 2017, Jamie filed a "Petition and Affidavit to Obtain Harassment Protection Order" against Maria pursuant to Neb. Rev. Stat. § 28-311.09 (Reissue 2016). Jamie also sought protection on behalf of her three children, which included J.S. (age 5). She claimed that in March, "for a long period of time," she had been receiving emails from Maria repeatedly saying, "'Only God can stop me from seeing my son.'" Jamie alleged, "I believe she will kill me." Jamie claimed the emails stopped at the end of March, but that Maria then "started appearing at my house." Jamie claimed that at the beginning of April, "I began seeing Maria sitting in front of my house with 2 other people watching. I was scared she was going to hit and punch me. I was scared she would shoot me." She added, "Maria has been increasing in frequency." Finally, she alleged that in May, Maria was watching her, then got out of her vehicle and walked by twice. Jamie averred, "I was afraid she was going to kill me, so I left town for a week."

A 1-year ex parte harassment protection order, pursuant to § 28-311.09, was entered in favor of Jamie by the court on May 15, 2017. The order did not apply to family or household members, as requested by Jamie. On May 17, Maria filed a request for a hearing on the ex parte protection order.

At the hearing on June 29, 2017, Maria appeared with counsel; Jamie appeared without counsel. Upon questioning by Maria's attorney, Jamie indicated she did not have with her the emails mentioned in her petition. Maria's attorney offered, and the court received, exhibit 1, which was a "Petition and Affidavit to Obtain Harassment Protection Order" filed by Jamie against Maria on August 14, 2015. Maria's attorney pointed out that in the 2015 petition, Jamie similarly alleged receiving an email from Maria, in which she claimed Maria said in July, "'God gave me my son for a reason, and only he can take him from me.'" Jamie also alleged in the 2015 petition, "I am afraid she will kill me." We note that Jamie further alleged in the 2015 petition that Maria was "threatening legal action" in July, and also, that she received a text from Maria (similar to the email language), and Jamie was "[a]gain . . . scared she will kill me." Jamie's 2015 petition for a harassment protection order was dismissed by the district court without a hearing.

Upon further questioning from Maria's attorney, Jamie testified that the last email she received from Maria was in December 2016. (We note this is not consistent with the allegation in the petition wherein she said the emails stopped at the end of March 2017.) Jamie testified that she saw Maria's car parked "outside my house" in April, and that she saw Maria "walking by my house" in May. Jamie said she did not take a picture, but she did call the police. She said she had a police report, but not with her. When asked why the presence of Maria at or near her home made Jamie believe Maria was going to kill her, Jamie responded, "Because she said that she will do anything to see her son." The colloquy continued as follows:

> [Counsel for Maria]: But that's not what you say here. You said that only - she says only God can stop her from having a relationship with her son. And so then you're deriving from that statement that [Maria] is going to kill you?
>
> Jamie: Well, I'm not God, so I wouldn't be able to stop her, I suppose.
>
> [Counsel for Maria]: So, that statement that she made makes you believe that [Maria] will kill you?
>
> Jamie: Yes.

The court then questioned Jamie about her adoption of J.S., and the court asked, "And you're just disturbed, basically, because [Maria] keeps appearing . . . close to your residence?" Jamie said, "Yeah." The court asked if J.S. knew Maria, and Jamie said, "I - I think so." When asked by the court whether J.S. sees Maria outside the residence, Jamie replied, "I don't know that he'd know what to look for."

Maria testified that the last time she had been near Jamie's home was in May 2016, and that she had not been anywhere near Jamie's home in 2017. Maria responded "no" when asked if she had ever threatened Jamie or physically harmed her. She explained she went to Jamie's home in May 2016 because Jamie had posted on Facebook that she was having a yard sale. Maria had a daughter who had passed away from a medical condition while under Jamie's care, and Jamie was selling some of Maria's daughter's items.

The court also questioned Maria. In response, Maria testified that the last email she sent in December 2016 was about "our contract that we had signed, I'm supposed to be receiving pictures of my son and a summary of him, every July, every December, and I didn't receive that." Maria indicated she was also supposed to be sending gifts to J.S., and she wanted to send gifts, but Jamie "didn't respond." Maria said the email she sent to Jamie also mentioned that she "wanted us to be adults and deal with it together, or I would hire an attorney, and that's what I did." The court asked for a copy of the contract, and Maria's attorney pointed out there was another lawsuit which the court was also presiding over. The contract was marked and then subsequently unmarked as an exhibit since the court concluded the protection order hearing would be continued so that it could be heard at the same time as a hearing scheduled on the other action.

The parties reconvened in court on July 13, 2017, and the record reflects that a hearing in the other case was held that morning and the matter was taken under advisement. The continuation of the protection order was taken up, and both parties were represented by counsel at this hearing.

Jamie's attorney had Jamie testify again. She asked Jamie if everything contained in the affidavit was true and accurate; Jamie said, "Yes." The affidavit was received over objection by Maria's attorney. Additionally, a photograph was marked as an exhibit and was alleged by Jamie to be a picture she took of Maria "[r]ight down the street." (We note that at the prior hearing, Jamie said she did not take any pictures of Maria walking outside her home.) The picture shows the backside of a female walking on a sidewalk in the distance. It was received over objection by Maria's attorney. (Maria subsequently testified and denied that it was a picture of her.) With regard to the incident of Maria walking near Jamie's home, Jamie testified that Maria was "[j]ust watching our house." Jamie saw her walk up and down the street twice. On cross-examination, Maria's counsel asked Jamie, "So, you're saying, by [Maria] walking by your house, that you had to leave town?" Jamie replied, "Yes."

With regard to the time Maria was with two other people in a car parked on the opposite side of the street, Jamie testified they were sitting there "not very long" after she noticed them, "probably two minutes." Jamie acknowledged she had entered into a "contact agreement" with Maria prior to the adoption (of J.S.), but that Jamie had not been allowing that contact. Jamie said she was not fulfilling the obligations of the contact agreement because the agreement was not ordered by the judge in the adoption proceeding, and according to Jamie, the adoption judge said the contact agreement was not in J.S.' best interests.

After arguments by both parties' attorneys, the court stated, "Well, in light of the circumstances, I am going to go ahead and affirm the protection order." The court entered a "Harassment Protection Order (After Hearing, Ex Parte Order Issued)" on July 13, 2017, leaving in effect for 1 year the ex parte order previously entered on May 15. No specific findings are set forth in the July 13 order.

## ASSIGNMENT OF ERROR

Maria assigns the district court erred by finding sufficient evidence to support a harassment protection order.

## STANDARD OF REVIEW

A protection order is analogous to an injunction; the grant or denial of a protection order is reviewed de novo on the record. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010).

## ANALYSIS

We begin our analysis with a review of the statutes applicable to harassment protection orders. Section 28-311.09 provides in relevant part:

(1) Any victim who has been harassed as defined by section 28-311.02 may file a petition and affidavit for a harassment protection order . . . Upon the filing of such a petition and affidavit in support thereof, the court may issue a harassment protection order without bond enjoining the respondent from (a) imposing any restraint upon the person or liberty of the petitioner, (b) harassing, threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of the petitioner, or (c) telephoning, contacting, or otherwise communicating with the petitioner.

The purpose of § 28-311.09, and the definition of certain terms, are contained in Neb. Rev. Stat. § 28-311.02 (Reissue 2016), which provides in relevant part:

(1) It is the intent of the Legislature to enact laws dealing with stalking offenses which will protect victims from being willfully harassed, intentionally terrified, threatened, or intimidated by individuals who intentionally follow, detain, stalk, or harass them or impose any restraint on their personal liberty and which will not prohibit constitutionally protected activities.

(2) For purposes of sections 28-311.02 to 28-311.05, 28-311.09, and 28-311.10:

(a) Harass means to engage in a knowing and willful course of conduct directed at a specific person which seriously terrifies, threatens, or intimidates the person and which serves no legitimate purpose;

(b) Course of conduct means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including a series of acts of following, detaining, restraining the personal liberty of, or stalking the person or telephoning, contacting, or otherwise communicating with the person.

Application of the law governing harassment protection orders has been summarized as follows:

"Nebraska's stalking and harassment statutes are given an objective construction and . . . the victim's experience resulting from the perpetrator's conduct should be assessed on an objective basis. *In re Interest of Jeffrey K.*, 273 Neb. 239, 728 N.W.2d 606 (2007). Thus, the inquiry is whether a reasonable [victim] would be seriously terrified, threatened, or intimidated by the perpetrator's conduct. *Id.*"

*Richards v. McClure*, 290 Neb. 124, 132, 858 N.W.2d 841, 847 (2015) (quoting *Glantz v. Daniel*, 21 Neb. App. 89, 837 N.W.2d 563 (2013)) (brackets in original). "Where the evidence is insufficient, the appellate courts have reversed and vacated harassment protection orders issued by lower courts." *Richards v. McClure*, 290 Neb. at 132-33, 858 N.W.2d at 848.

Upon our de novo review of the record, we conclude that the evidence was insufficient to demonstrate that a reasonable victim in Jamie's position would feel "seriously terrified, threatened, or intimidated" by Maria's conduct. There were three allegations of harassment alleged in Jamie's petition and discussed at the hearings: (1) Maria walked up and down the street by Jamie's house twice on 1 day in May 2017; (2) Maria sat in a car across the street with two other people for a couple of minutes (after being noticed) on 1 day in April 2017; and (3) Maria sent one or more emails (the last being in December 2016) saying that only God could stop her from seeing her son. We conclude that such evidence does not establish a knowing and willful course of conduct which would cause a reasonable victim to be seriously terrified, threatened, or intimidated.

Even if the district court found Jamie's testimony more believable than Maria's, the evidence of Maria walking past Jamie's house a couple times and sitting in a vehicle across the street for a couple minutes does not evidence a continuity of purpose by Maria to terrify, threaten, or intimidate Jamie. There was no evidence of any statements or gestures made by Maria towards Jamie during these instances. This is not to say threatening statements or gestures are required. Certainly a pattern of conduct of being frequently present at or near Jamie's home could sufficiently constitute harassment. In this case, there is simply not a pattern of such conduct based on the two instances noted.

Additionally, with regard to Jamie's allegation in her 2017 petition about Maria's email to her, we bear in mind that this allegation is almost identical to the one Jamie made in August 2015. In the 2015 allegation, Jamie claimed that in July Maria said, "'God gave me my son for a reason, and only he can take him from me.'" Jamie's response to this was, "I am afraid she will kill me." And then in 2017, Jamie claimed that in March "for a long period of time," she had been receiving emails from Maria repeatedly saying, "'Only God can stop me from seeing my son.'" Jamie's response was once again, "I believe she will kill me." However, Jamie produced no evidence to show that Maria ever engaged in any threatening or violent behavior towards Jamie within the almost 2-year period between these alleged email threats to justify perceiving these statements as seriously terrifying, threatening, or intimidating. The fact that Maria was adamant about seeing her son would not suggest to a reasonably objective person that such a statement was intended as a threat of violence. Further, Jamie testified the last email sent was in December 2016, and while Jamie said she had the emails when she was asked about them at the first hearing, she had not brought them with her. Notably, no emails were offered when the parties reconvened for the final hearing on this matter. But even accepting as true the statements Jamie claimed Maria made in the

emails, such statements would not have caused a reasonably objective person to be seriously terrified, threatened, or intimidated.

At the end of the final hearing, the district court decided to maintain the protection order "in light of the circumstances." The district court may well have been aware of other circumstances stemming from the other action presented to the court on the same day as this matter. However, this court can only review the record presented on appeal, and there is simply not enough evidence to show that Maria engaged in a knowing and willful pattern of conduct evidencing a continuity of purpose directed at Jamie which a reasonably objective person would find seriously terrifying, threatening, or intimidating.

## CONCLUSION

The district court erred in ordering the ex parte harassment protection order against Maria to remain in effect for 1 year. Accordingly, we reverse and remand with directions to vacate the harassment protection order.

REVERSED AND REMANDED WITH DIRECTIONS.